IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MONICA JOSEY JAMES, ARLINDA L. JOHNS, and TYRELLE HINSON, <br><br>Plaintiffs, <br><br>vs. <br><br>JASON LYDON, BLACK AND PINK, INC., JOHANNES WILSON, ZAHARA GREEN, MEGAN SELBY, and JOHN DOES 1-TBD, <br><br>Defendants. | Case No. 19 C 3366 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Monica Josey James, Arlinda L. Johns, and Tyrelle Hinson have sued their former employer, Black & Pink, Inc., along with a handful of individuals associated with the organization. The plaintiffs have alleged claims of race-based discrimination and retaliation in violation of 42 U.S.C. § 1981 and state law claims of fraud and defamation. The defendants have moved for summary judgment on all the claims. For the reasons stated below, the Court grants the motion.

### Background

The following facts are undisputed except where otherwise noted. Black & Pink is a national nonprofit that serves LGBTQ people who are or have been incarcerated. Jason Lydon founded the organization in 2005, at which point it had no formal structure, and he served as its National Director from the time of founding through August 17,

2017. Johannes Wilson was, at all times relevant to this suit, a member of Black & Pink's board of directors. Zahara Green and Megan Selby were general members of the organization, and in November 2017, Green became a board member.

In 2012, members of Black & Pink, including Lydon, formed an informal board called the Leadership Circle, which helped set the organization's direction and determined how to spend money. In 2015, a transition team and interim leadership circle was created with the purpose of reimagining the future structure of the organization, which included hiring a new National Organizer and National Director, drafting more formal policies, and generally changing the organizational leadership "to better reflect those directly affected by the criminal legal system." Pls.' Resp. to Defs.' Local Rule 56.1(a)(2) Stat. ¶ 13 (dkt. no. 166). In 2016, Black & Pink filed as a 501(c)(3) nonprofit and accordingly established a formal board of directors. The Leadership Circle, however, continued to exist, and the defendants contend that it directly supervised the National Organizer and National Director positions.

A.    James's experience at Black & Pink

James began working for Black & Pink as the National Organizer in March 2017. At the end of June, James began a dating relationship with a member of Black & Pink, Frank Place, a white man. In July, James discovered that Place had recorded a consensual sexual encounter between them without her consent and threatened to report him to the police if he ever did it again. James later sent Place a text message that said, "I owe u an apology for letting my hurt and shame get the best of me. . . . I will never bring u harm and I'm sorry to even pretend or say I will." *Id.* ¶ 51.

The plaintiffs contend that after learning about the incident, Lydon told James

2

that if she wanted to keep her job, she should find a way to apologize to Place. James's fallout with Place also led to plaintiff Hinson threatening violence against James, though the plaintiffs contend that Lydon "manipulated" Hinson into action by providing incomplete information about the relationship between James and Place. *Id.* ¶ 55.

Michael Cox, another member of Black & Pink's board, was friends with Place. In the aftermath of James's fallout with Place, the plaintiffs allege that Wilson and Cox demanded to record all their interactions with James and characterized her as "aggressive." *Id.* ¶ 59. James complained about Cox to Black & Pink's board, the Leadership Circle, and Johns, who was Black & Pink's National Director at that time. The Leadership Circle investigated the conflict between James and Cox. Concluding that the conflict involved James and Place, the Leadership Circle requested that Cox and Place refrain from contacting each other.

In December 2017, James sent Wilson and members of the Leadership Circle multiple e-mails expressing her frustration with the organization. For example, in one e-mail she wrote, "I have all the egregious things y'all did on paper your own emails. Y'all should step down and do a public statement of your crimes." *Id.* ¶ 42. The Leadership Circle then met with James. According to the plaintiffs, James "made it clear" to the defendants that she didn't "want to sweep [their conduct] under the rug.'" *Id.* ¶ 44. On December 21, she received a notice of termination from the Leadership Circle.

B.   **Johns's experience at Black & Pink**

On August 17, 2017, Johns began working for Black & Pink as its National Director and moved to Boston to assume this role. The parties dispute whether Johns knew that the Leadership Circle would supervise her work and whether she needed

3

approval for expenses over $1,000.  In November 2017, Johns withdrew $50,000 from the organization's account, which she converted to a cashier's check in Black & Pink's name, without the permission of the Leadership Circle.  Johns also spent from the Black & Pink account—without permission—more than $3,000 on an Airbnb and Jay-Z concert tickets, as well as an unspecified amount on her rent.  Johns contends that the concert tickets were to be auctioned off as a fundraiser for Black & Pink.

On December 4, 2017, the Leadership Circle terminated Johns's employment with Black & Pink.  Dominique Morgan replaced Johns as the new National Director.

**C.     Hinson's experience at Black & Pink**

Hinson started volunteering for Black & Pink in 2008 and was eventually hired as the office manager in 2016.  During Johns's employment as National Director, she served as Hinson's supervisor.  On October 17, 2017, at the direction of Johns and without the authorization of the Leadership Circle or the current board of directors, Hinson filed new articles of incorporation with the secretary of state that would change Black & Pink's board of directors.  When Morgan replaced Johns, Hinson expressed his discontent with his new boss by posting publicly on Black & Pink's Facebook page.  He was "asked not to continue making posts undermining the organization, . . . but he continued making inflammatory posts about Black and Pink."  *Id.* ¶ 80.

On January 28, 2018, Hinson received a termination letter stating that his date of separation from Black & Pink would be January 31, 2018.  The letter cited multiple violations of the employee handbook, including violations of the social media policy and interfering with the work of another staff member.

4

D.  **January 2018 letter**

In January 2018, the Leadership Circle circulated a letter describing the events leading up to the departures of James and Johns to Black & Pink's listserv, funders, and other advocacy organizations. The letter stated among other things that Johns "attempted to withdraw and cash substantial funds from the organizational bank account" and "worked with [James] to contact major funders to try to persuade them to stop funding B&P." Defs.' Rule 56 Exs. at 177–78 (dkt. no. 156). It also stated that James "attempt[ed] to extort funds from B&P" and worked with Johns to "contact and dissuade funders." *Id.* at 178. The plaintiffs do not dispute that the letter contains these quotes, though they contend that the letter failed to include all the context surrounding their departures.

D.  **Procedural history**

In May 2019, James and Johns sued Black & Pink, Lydon, several members of Black & Pink's leadership, and some general members of the organization—twelve defendants in total. The defendants moved to dismiss all of the claims in the plaintiffs' first amended complaint; they also moved to dismiss seven of the defendants for lack of personal jurisdiction. The Court dismissed the complaint, with leave to amend, except as to the defendants dismissed on jurisdictional grounds.

James and Johns filed a second amended complaint against the five remaining defendants—Black & Pink, Lydon, Wilson, Selby, and Green—in February 2020. They alleged two claims under 42 U.S.C. § 1981: hostile work environment as to James (count 1) and retaliation against James and Johns (count 2). They also asserted multiple state law claims: fraud (count 3), defamation of James (count 4) and Johns

5

(count 5), and constructive discharge of James (count 6). The Court granted the defendants' motion to dismiss counts 2 and 6.

James and Johns then added Hinson as a plaintiff, and collectively they filed a third amended complaint against the same defendants. They asserted the same claims, including a reassertion of claims 2 and 6, and they added a claim of retaliation against Hinson (count 7). The Court granted the defendants' motion to dismiss counts 2 and 6 (as before) but denied the motion to dismiss the remaining counts.

## Discussion

To obtain summary judgment, a party must demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine issue of material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The non-moving party must identify "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Cervantes v. Ardagh Grp.*, 914 F.3d 560, 564 (7th Cir. 2019).

The Court will address the section 1981 claims first and the state law claims second.

A.   **Section 1981 claims**

   1.   **Hostile work environment (count 1)**

James contends that Black & Pink, Lydon, and Wilson were responsible for a racially hostile work environment that violated her rights under section 1981. To prevail on this claim, James has to establish that (1) she was subject to unwelcome harassment (2) based on her race (3) that was so severe or pervasive as to alter the conditions of employment, and (4) there is a basis for employer liability. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018). A section 1981 plaintiff must prove that her "injury would not have occurred 'but-for' the defendant's unlawful conduct." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1013 (2020).

James contends that the unwelcome harassment consisted of Lydon bringing "her intimate matters into the workplace, [and] then incit[ing] her co-worker to fight her." Pls.' Memo. of L. in Opp'n to Defs.' Mot. for Summ. J. at 2 (dkt. no. 167). She further points to "Cox demand[ing] that she be subject to recording in order to have a meeting" and inviting her "to fight it out like the 'old days.'" *Id.*

James's claim falters when it comes to establishing the second element. The plaintiffs detail seven points that they argue support a finding that James's alleged harassment was specifically based on race. Construing the evidence in the light most favorable to James as the Court must, none of these points—separately or collectively—would permit a reasonable factfinder to conclude that James's race caused the allegedly hostile work environment. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

7

First, the plaintiffs contend that "[i]t was acceptable for defendants to threaten law enforcement [against] Black people," but it was "against their values when a black person invoke[d] the legal system against white and non-black people." *Id.* at 3. The evidence cited does not support this contention. It shows an e-mail chain discussing a potential restraining order against James. There is nothing in it from which a jury reasonably could infer that the defendants did not want black employees to exercise their legal rights.

Second, the plaintiffs assert that Lydon sent Johns, a black person, to fire James, Lydon then sent Hinson, another black person, to "jump" James, and then Cox, a white person, came "to fight" James. *Id.* The evidence cited, such as Johns's statement in her affidavit that "White men were after James," shows that Lydon intended to fire James, which is not evidence of racially motivated harassment, regardless of the race of the person who delivered the termination news. Furthermore, the evidence cited does not describe the impetus behind any potential fighting, let alone any actual fighting.

Third, the plaintiffs contend that Lydon "created an organizational structure that deliberately evaded accountability by claiming to delegate authority to an amorphous group of people." *Id.* This contention has no bearing on the racial basis of the alleged harassment.

In their fourth, sixth, and seventh examples, the plaintiffs describe promotions and job responsibilities of various individuals. The plaintiffs assert that Cox "was rewarded for his racist and physically threatening conduct toward Plaintiff James" because he was promoted to Director of Black & Pink. *Id.* The plaintiffs similarly assert that Morgan and Cathy Jacobowitz, Black & Pink's bookkeeper at the time, were

"rewarded" for their "mistreatment of plaintiffs" with "salaries and the ability to incur expenses without any approval." *Id.* at 4. And again, the plaintiffs assert that David Booth, another Leadership Circle member, had a salary and could incur expenses without approval. The evidence cited for these three assertions simply shows that each of these individuals held these positions and their responsibilities; the evidence fails to show anything even indirectly related to James's alleged harassment. In addition, these points seem to essentially *assume*, rather than establish, the proposition that there was underlying race-based mistreatment.

The plaintiffs fifth (and last) point is that the defendants "created a system where the new black leadership of James and Johns was supposed to have an overseer/supervisor in the form of [the] Leadership Circle," whereas "the white leadership of Jason Lydon did not have any supervisory body" and Cox "was supported in creating a structure without any supervisory body." *Id.* Although the preferential treatment of employees based on a protected class can demonstrate the causal basis at issue, *see Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 715 (7th Cir. 2021), it is not apparent, nor have the plaintiffs explained, how this claimed disparate treatment regarding the Leadership Circle's supervisory capacity over Black & Pink's leadership tends to show that the unwelcome harassment that James, herself, has alleged was based on her race. Moreover, the Leadership Circle had a supervisory capacity when Lydon served as the National Director prior to Johns. And the plaintiffs' cited evidence shows that an advisory body supervises Cox in his role as executive director of Black & Pink today.

Put simply, the points cited by the plaintiffs would not permit a reasonable jury to

9

find that the alleged harassment of James was based on her race. "Although a connection between the harassment and the plaintiff's protected class need not be explicit, 'there must be *some* connection . . . .'" *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014)) (emphasis in original). The defendants are entitled to summary judgment on this claim.

### 2. Retaliation (count 7)

Hinson has alleged that Black & Pink retaliated against him for his opposition to Black & Pink's actions against James and Johns by firing Hinson, in violation of section 1981. To prevail on this claim, "an employee must show that she suffered a materially adverse action because she engaged in protected activity." *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016).

Hinson's response brief generically alleges the elements of a retaliation claim without referencing any specific facts or caselaw. *See* Pls.' Memo. of L. in Opp'n to Defs.' Mot. for Summ. J. at 14 (dkt. no. 167). This "failure to analyze the elements of [his] individual claim[] with reference to the evidence" is dispositive, especially when Hinson must establish the causal link between his termination and his opposition to discriminatory action. *Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 848 (7th Cir. 2015). Because Hinson has offered no evidence that would support a reasonable jury finding such a link, the defendants are entitled to summary judgment against him on this claim.

### B. State law claims

The parties' arguments regarding the state law claims apply Massachusetts law,

10

so the Court will likewise apply the law of that state. *See Selective Ins. Co. of S.C. v. Target Corp.*, 845 F.3d 263, 266 (7th Cir. 2016).

1.  **Fraud (count 3)**

Common law fraud under Massachusetts law consists of "a knowing false representation of a material fact intended to induce a person to act in reliance, where the person did, in fact, rely on the misrepresentation to his or her detriment." *Chelsea Hous. Auth. v. McLaughlin*, 482 Mass. 579, 591 n.12, 125 N.E.3d 711, 721 n.12 (2019). The plaintiffs contend that Lydon falsely represented to them "that there was a transition of Leadership from him to the Plaintiffs, and that once Plaintiff Johns replaced him, the existing board members would be replaced by members who were reflective of the communities served." Pls.' Memo. of L. in Opp'n to Defs.' Mot. for Summ. J. at 9 (dkt. no. 167).

This claim lacks merit because the plaintiffs' evidence would not permit a reasonable jury to find that this representation was false. In support, the plaintiffs cite exhibit G of their response to the defendant's statement of material facts, but that exhibit consists of an e-mail thread from September 2017 that does not support their contention in any way. *See* Pls.' Resp. to Defs.' Local Rule 56.1(a)(2) Stat., Ex. G (dkt. no. 166-7). Instead, the thread shows Black & Pink leaders discussing Leadership Circle meeting minutes and the organization's bylaws. This does not indicate that there was a fake transition of power that might have changed an existing condition of employment at Black & Pink, nor can it possibly be construed as evidence about a future condition of employment given that the e-mail traffic occurred well after both James and Johns began working for the organization. *See James v. Lydon*, No. 19 C 3366, 2020 WL

11

3192286, at *7 (N.D. Ill. June 15, 2020). The Court concludes that no reasonable jury could find for the plaintiffs on this claim.

### 2. Defamation (counts 4 and 5)

Under Massachusetts law, a defamation claim brought by a non-public figure has the following elements: (1) the defendant made a statement concerning the plaintiff to a third party; (2) the statement could damage the plaintiff's reputation in the community; (3) the defendant acted negligently; and (4) the statement caused the plaintiff economic loss or is the type of statement that is actionable without proof of economic loss, such as a statement that accuses the plaintiff of a crime. *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629–30, 782 N.E.2d 508, 510–11 (2003). As a general rule, to be actionable the statement about the plaintiff must be false. *See Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009) (discussing Massachusetts law).

James and Johns have alleged that several of the statements in the January 2018 letter that was circulated to Black & Pink's membership, funders, and outside organizations contained defamatory statements about them. As to the fourth element, the plaintiffs do not attempt to establish economic loss and instead contend that the defamatory statements accuse Johns of theft and James of extortion such that proof of economic loss is not required.

The plaintiffs have effectively conceded the underlying acts here, at least for purposes of the summary judgment motion. Specifically, the plaintiffs admit that "Johns charged approximately $2,200 to Airbnb and $1,039.05 for JayZ concert tickets and used the Black and Pink account to pay her rent, without the permission of the leadership circle." Pls.' Resp. to Defs.' Local Rule 56.1(a)(2) Stat. ¶ 38 (dkt. no. 166).

And the evidence is clear that Johns was required to seek Leadership Circle approval for spending over $1,000 that was not in the original budget, which is true of these expenses.  See, e.g., Pls.' Resp. to Defs.' Local Rule 56.1(a)(2) Stat., Ex. A42 (dkt. no. 166-68).  The plaintiffs also do not effectively dispute that "James made a number of communications to members of the Leadership Circle conveying she had proof of embarrassing and illegal conduct that would harm members of the leadership circle and the organization that she was going to expose if her demands were not met."  Pls.' Resp. to Defs.' Local Rule 56.1(a)(2) Stat. ¶ 41 (dkt. no. 166).  The plaintiffs do not refute this directly, and their non-responsive statements include an admission that James "made it clear" that she did not want to "escalate" the situation any further but at the same time did not "want to sweep [it] under the rug."  Id.  This, in context, amounts to a concession of the underlying allegation about James's conduct.

Understanding that truth is generally a defense to a defamation claim under Massachusetts law, the plaintiffs contend that the truth of the allegation that they committed these acts is "immaterial" because the defendants acted with actual malice.  Pls.' Memo. of L. in Opp'n to Defs.' Mot. for Summ. J. at 12–13 (dkt. no. 167); see Noonan, 556 F.3d at 28 (explaining how "even a true statement can form the basis of a libel action if the plaintiff proves that the defendant acted with 'actual malice'").  This, however, does not salvage their defamation claims.  Actual malice requires publication "with either knowledge of untruth or a reckless disregard as to whether [the statements] were false."  LaChance v. Bos. Herald, 78 Mass. App. Ct. 910, 913, 942 N.E.2d 185, 189 (2011).  The plaintiffs' sole support for the proposition that the defendants acted with actual malice is that they sent the letter "to many organizations across the country

13

and publish[ed] it in [a] newsletter that is circulated in jails and prisons across the country." Pls.' Memo. of L. in Opp'n to Defs.' Mot. for Summ. J. at 12–13 (dkt. no. 167). Widespread circulation, however, is not evidence from which a reasonable jury could infer actual malice.

Because plaintiffs cannot establish key elements of their defamation claims, the defendants are entitled to summary judgment on those claims.

## Conclusion

For the foregoing reasons, the Court grants the defendants' motion for summary judgment [dkt. no. 148] and directs the Clerk to enter judgment in favor of the defendants and against the plaintiffs.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 22, 2022